

# Missouri Court of Appeals
## Southern District

### In Division

LANDS' END PROPERTIES, LLC,    )
et al.,                        )
                               )
    Plaintiffs-Respondents,    )
                               )
v.                             )    No. SD38117
                               )    Filed:  March 26, 2025
THE GRAND MERIDIAN             )
CONDOMINIUM OWNERS'            )
ASSOCIATION, INC., et al.,     )
                               )
    Defendants-Appellants.     )

### APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

Honorable Kenneth M. Hayden, Circuit Judge

**<u>AFFIRMED</u>**

Following a bench trial, the trial court ruled in favor of Lands' End Properties, LLC (LEP), and against the Grand Meridian Condominium Owners' Association (Association) on the first count of LEP's petition to declare that LEP "retains its development rights[.]"  The court ruled in favor of the Association and against LEP on the second count of LEP's petition. The court decided that:  (1) the five-year statute of limitations in § 516.120 applied; and (2) LEP owed unpaid assessments on its two units after March 28, 2013.[1]

---

[1] All statutory references are to RSMo (2000).  All rule references are to Missouri Court Rules (2024).

The Association appeals, presenting 13 points. Eight points contend the trial court misapplied the law with respect to: (1) the court's determination that LEP retained its development rights; and (2) the court's calculation of the amount that LEP owed in assessments, including the application of a five-year statute of limitations. The remaining five points involve one evidentiary ruling and several challenges to the court's findings on the ground that they are against the weight of the evidence. Finding no merit in any of these points, we affirm.

**Standard of Review**

A judgment is presumed correct, and the party challenging the judgment bears the burden of proving it erroneous. *Brackney v. Walker*, 670 S.W.3d 455, 458 (Mo. App. 2023). In this court-tried case, our review is governed by Rule 84.13(d) and *Murphy v. Carron*, 536 S.W.2d 30, 31-32 (Mo. banc 1976). We are required to affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014). "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c); *see Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 437 (Mo. banc 2020). When considering whether the court misapplied the law, we review the court's legal conclusions and application of law to the facts *de novo*. *McLeod v. McLeod*, 681 S.W.3d 215, 228-29 (Mo. App. 2023). In addition, "[s]tatutory interpretation is an issue of law that this Court reviews *de novo*." *Crockett v. Polen*, 225 S.W.3d 419, 420 (Mo. banc 2007); *see Clampit v. Cambridge Phase II Corp.*, 884 S.W.2d 340, 345 (Mo. App. 1994).

Interpretation of the language of a condominium declaration also is reviewed *de novo*. *Haines v. Branson Cabin Rentals, LLC*, 635 S.W.3d 172, 174 (Mo. App. 2021). "We construe condominium declarations strictly." *Id*.; *see Clampit*, 884 S.W.2d at 345. The rule of strict

2

construction means that we cannot give the declaration "a broader application than is warranted by its plain and unambiguous terms, and we cannot presume anything that is not expressed by the declaration." *Taticek v. Homefield Gardens Condo. Ass'n*, 502 S.W.3d 645, 648 (Mo. App. 2016) (internal quotation marks omitted). This provides condominium buyers with confidence that what they see is what they get, and that a court acting under its equity powers will not act in contravention of the declaration. *Clampit*, 884 S.W.2d at 345. Further, "[i]n determining the meaning of [declaration] provisions, we consider the document as a whole and give the words their natural and ordinary meaning." *Willows Condo. Owners Ass'n, Inc. v. Kraus*, 467 S.W.3d 312, 314 (Mo. App. 2015).

Lastly, in reviewing the evidence, we defer to the trial court's determination of the credibility of witnesses. *Brackney*, 670 S.W.3d at 459. "The trial judge is in a better position than this court to determine the credibility of the parties, their sincerity, character and other trial intangibles which may not be shown by the record." *Kelley v. Prock*, 825 S.W.2d 896, 897 (Mo. App. 1992). Further, a trial court is free to believe or disbelieve all or any part of the witnesses' testimony. *In re C.C.S.*, 393 S.W.3d 105, 108 (Mo. App. 2013). Therefore, "[w]e view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences." *Id*. So viewed, the following facts were proven at trial.

**Factual and Procedural History**

LEP was formed in October 2002 for the purposes of developing, marketing and selling condominiums at "The Grand Meridian Condominiums at Lands' End" project (Project). Stuart Dabbs (Dabbs) and Kevin Brown (Brown) each owned a 50% membership interest. Brown was the managing member until he passed away in April 2016, at which time Dabbs became the managing member.

On July 24, 2003, the Association was organized for the purpose of administering and operating the Project. On July 30, 2003, LEP recorded the Condominium Declaration for the Project (the Declaration) for the purpose of creating a planned community of condominiums. The Declaration was prepared in accordance with the Missouri Uniform Condominium Act (the Act).[2] Every original purchaser received an "Original Sales Certificate" that included a copy of the Declaration. According to the Declaration, LEP had the right to construct up to 280 condominium units at the Project. At the time of trial, the Project consisted of 192 units.

Article XV of the Declaration addresses LEP's development rights. According to § 15.1, LEP, as the "Declarant[,]" reserves all development rights "[u]ntil the expiration of the Declarant Rights Period":

> **Reservation of Development Rights**. *Until the expiration of the Declarant Rights Period, Declarant reserves the rights to exercise all "Development Rights"*, as defined from time to time in the Act (and so referred to herein as "Development Rights") with respect to all of the Property, other than to the extent hereinafter limited with respect to a specific Development Right. The rights hereinafter set forth may be terminated prior to the expiration of the Declarant Rights Period only upon the filing by Declarant of an amendment to the Declaration expressly terminating a specific right. The Development Rights reserved hereunder shall specifically include, without limitation, the rights set forth in Subsections 15.1.1 through 15.1.6.

§ 15.1 (emphasis added).[3] Section 3.20 of the Declaration defines the "Declarant Rights Period" as beginning on the date the Declaration was recorded and ending on the date LEP conveys "all units … originally owned by [LEP.]"

The last unit sold by LEP was in April 2013. LEP retained ownership, however, of Units 1-E100 and 1-E101, which have never been conveyed to another party. LEP does not have a lease for any boat slips, nor has LEP been assigned or leased any garage spaces.

---

[2] The Act is comprised of "Sections 448.1-101 to 448.4-120[.]" *See* § 448.1-101.

[3] With respect to termination of development rights, no evidence was presented that LEP filed an amendment terminating its development rights as required by § 15.1.

4

Lastly, as relevant here, the Declaration also reserved the right of LEP to submit additional property to the Project. Section 15.1.1 provides:

> **Option to Add Real Estate to the Condominium**. Declarant reserves the right to add to the Condominium in whole or in portions, the real estate described on Exhibit D ("Potential Added Land").

*Id.*[4] The real estate described on Exhibit D includes the "Point" property (Point), which is the subject of the underlying controversy between the parties.

In 2015, LEP began marketing for sale and taking reservations for units to be constructed on the Point. In October 2017, LEP learned that the Association opposed development of the Point. The Association took the position that: (1) LEP no longer retained development rights; and (2) LEP owed assessments on the two units it owns, Units 1-E100 and 1-E101.

In March 2018, LEP filed its first amended petition (Petition) seeking declaratory relief in its first two counts. These counts requested the trial court to declare that: LEP retains its development rights based on the aforementioned Declaration provisions (Count 1); and LEP is not obligated to pay assessments on the two units it owns based on Declaration § 4.2.1.[5]

---

[4] Once submitted to the Project, there was no provision in the Declaration reserving the right of LEP to withdraw property from the Project.

[5] Section 4.2.1 of the Declaration provides:

> **Building Status as Master Unit**. Notwithstanding the foregoing, each Building shown on the Plat shall be deemed to constitute one master Unit, owned by Declarant. Declarant reserves the Development Rights, as set forth in Section 15.1 of this Declaration, to subdivide such Master Unit into the Units depicted on the Building Plat …. Until such time as all the Units depicted on the Building Plat shall have been conveyed to purchasers other than Declarant, the Allocated Interest for the Master Unit shall equal one percent (1%); provided however, that *Declarant shall be responsible for all expenses associated with such Building as is not provided for by the assessments attributable to Units therein which are owned by purchasers other than Declarant*. [Emphasis added.]

5

According to LEP, the foregoing Declaration provision states that the Association is not entitled to collect assessments on its two units, so long as LEP is paying all expenses associated with those units until LEP conveys them to a purchaser (Count 2).[6]

In response, the Association filed a counterclaim opposing LEP's first two counts. In Count 1, the Association denied that LEP retains development rights because, *inter alia*, § 3.20 defining "Declarant Rights Period": (1) "fails to state a time limit in which LEP must exercise its development rights"; and (2) even if § 3.20 stated a time limit, such a time limit is "unconscionable" because it is "unknowable and perpetual and should not be enforced against purchasers of condominium units and the Association" pursuant to § 448.1-112 (providing that a court may refuse to enforce unconscionable clause). In Count 2, the Association alleged that LEP owed assessments on its two units because Declaration § 4.1.2 "discriminate[s] against other condominium units in LEP's favor by not requiring LEP to pay common expense assessments" in violation of § 448.2-107.1 (allocations of interest in common elements "may not discriminate in favor of units owned by the declarant").

The Association's third-amended counterclaim, filed in September 2022, included five more counts. These counts requested: punitive damages (Count 3); an accounting (Count 4); damages for the cost of repair of a roadway and parking lot (Count 5); a resulting trust (Count 6); and, alternatively, a constructive trust (Count 7).

In October 2022, a bench trial was conducted. The trial court agreed with LEP as to Count 1, but disagreed with LEP as to Count 2. With respect to Count 1, the court declared that LEP properly preserved its development rights and, therefore, must be permitted to complete the development of the Project. The court did not make any findings with respect to the

---

[6] LEP's first amended petition alleged 11 counts, of which nine counts have since been dismissed. The first two counts remained viable and are relevant here.

6

Association's argument that § 3.20 was "unconscionable." As for Count 2, the court agreed with the Association that LEP owes assessments on its two units "after March 28, 2013" through and after December 31, 2022 "for as long as [LEP] owns said units." The court applied the five-year statute of limitations in § 516.120 to determine that the assessments were due after March 28, 2013.

With respect to the Association's additional counts in its amended counterclaim, the trial court found against the Association on its Counts 3, 4, 6 and 7. The court found in favor of the Association, however, on its Count 5. The court ordered LEP to "lay a second layer of asphalt … within 60 days of the completion of the construction on the Point[,]" rendering the Association's "request for damages for repair to [the] roadway and parking lot … moot in light of the Court's Judgment."

Thereafter, the Association filed a motion to amend the judgment or for a new trial, both of which the trial court denied.[7] This appeal followed. Additional facts will be included below as we address the Association's 13 points on appeal. For ease of analysis, we will address these points out of order.

### Discussion and Decision

In four of the Association's points, the Association contends the trial court "misapplied the law" with respect to its ruling that LEP retained its development rights (Points 3, 4, 13 and 10). Next, also in four points, the Association contends the court also "misapplied the law" in calculating the amount of assessments that LEP owes (Points 2, 8, 7 and 12). Lastly, in the remaining five points, the Association challenges a ruling in an evidentiary matter (Point 11),

---

[7] The Association's motion presented similar issues and arguments as those raised on appeal.

and maintains that four findings by the trial court are against the weight of the evidence (Points 1, 5, 6 and 9). We will address each point in turn.

### Development Rights – Points 3, 4, 13 and 10

The Association contends LEP did not retain its development rights because: the Declaration fails to state a sufficient "time limit" for LEP to exercise its development rights (Point 3); LEP's development rights are prohibited by its failure to pay costs, insurance and taxes on the Point property (Point 4); and LEP's failure to turn control of the Association over to unit owners terminated LEP's development rights (Point 13). The Association further takes issue with the court's order to lay asphalt (Point 10). Each of these points is separately identified and discussed below.

### Point 3 – "Time Limit" to Exercise Development Rights

Point 3 contends the trial court misapplied the law in determining "that the Declaration states a 'time limit' in which LEP could exercise development rights" because "the language in the Declaration reserving LEP's development rights is not a 'time limit' as required" by § 448.2-105.1(8) of the Act. We disagree.

Section 448.2-105 provides in relevant part:

> 1. The declaration for a condominium shall contain:
> …
> (8) A description of any development rights and other special declarant rights reserved by the declarant, together with a legally sufficient description of the real estate to which each of those rights applies, and *a time limit within which each of those rights shall be exercised*[.]

§ 448.2-105.1(8) (emphasis added). As mentioned previously, § 3.20 of the Declaration defines the "Declarant Rights Period" as beginning on the date the Declaration was recorded, and ending on the date LEP conveys all units that LEP originally owned:

8

> **"Declarant Rights Period"** means the period beginning the date this Declaration is first recorded in the office of the Recorder of Deeds of Camden County, Missouri, and *ending the date on which Declarant shall have conveyed to parties* (other than a Successor Declarant) *all units, as defined in the Act, originally owned by Declarant* in the Community.

(Emphasis added.)

The trial court determined that the "time limit" set forth in the Declaration complies with § 448.2-105.1(8) and "is not infinite" as the Association argued. The court noted that § 448.2-105.1(8) "does not provide a maximum time limit for the exercise of development rights" and refused to add language to this section of the statute for the following reason:

> This section does not require a clear date or maximum term of years. This Court will not add language to this statute. If the legislature had intended to set forth a maximum time limit in this section they could have done so as they did in Section 448.3-103.4 RSMo … wherein the legislature set forth maximum time limits defining the period of declarant control of the association.

We agree with the trial court. The primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute. ***Black River Motel, LLC v. Patriots Bank***, 669 S.W.3d 116, 122 (Mo. banc 2023). "In construing a statute, courts cannot add statutory language where it does not exist; rather, courts must interpret the statutory language as written by the legislature." ***Peters v. Wady Indus., Inc.***, 489 S.W.3d 784, 792 (Mo. banc 2016) (internal quotation marks and citation omitted); *see* ***Li Lin v. Ellis***, 594 S.W.3d 238, 241-42 (Mo. banc 2020). Similarly, the rule of strict construction of the Declaration means that we cannot give § 3.20 "a broader application than is warranted by its plain and unambiguous terms[.]" ***Taticek***, 502 S.W.3d at 648 (citation omitted). Further, "we cannot presume anything that is not expressed by the [D]eclaration." ***Id***.; *see* ***Shaw v. Mega Indus., Corp.***, 406 S.W.3d 446, 472 (Mo. App. 2013).

Thus, the plain language of § 448.2-105.1(8) requires the Declaration to simply contain "a time limit within which [LEP's development rights] shall be exercised." *Id*. Section 3.20 complies with that statutory requirement by providing a beginning and end date within which LEP must act. No maximum time limit was required. Accordingly, the trial court did not misapply the law in concluding the time limit in the Declaration complied with § 448.2-105.1(8). Point 3 is denied.

*Point 4 – Point Costs, Insurance, and Taxes*

Point 4 contends the trial court misapplied the law in determining "LEP's failure to pay costs and maintenance, insurance, and taxes on the 'Point' for 14 years does not prohibit LEP from exercising the development right [to] construct additional units on the Point because … § 448.3-107.2 requires the developer to pay such costs on real property in which it has reserved development rights." We disagree.

Here, the trial court acknowledged that "LEP has not paid for maintenance and other expenses attributable to the to the real property it now desires to develop at least since 2009, as required by Section 448.3-107.2[,] except for maintaining liability insurance thereon." The court went on to conclude, however, that any violation of this statute "is minor in nature" because:

> The Association has not billed LEP for any costs or expenses attributable to the Point. … There is no evidence before this Court as to what the maintenance costs of the Point have been. Accordingly, any violation of Section 448.3-107.2 by LEP is minor in nature and should not subject LEP to liability for attorney fees of the Association. Neither was such violation willful, wanton and malicious or outrageous because of LEP's evil motive or reckless indifference to the rights of the Association. In so ruling this Court is aware that the Camden County Assessor has not assessed LEP ad volorem real property taxes against the Point. LEP can only pay the real estate taxes for which it is assessed. The manner in which the Camden County Assessor has assessed the ad volorem real estate taxes for the Point is not binding on this Court or determinative of the issues before this Court.

10

While § 448.3-107.2 does require that "the declarant alone is liable for all expenses in connection with real estate subject to development rights[,]" this statute does *not* prohibit LEP from exercising the development rights due to a failure to pay such expenses as the Association contends. The Association fails to cite any other statutory authority or caselaw to support its contention. As such, the trial court did not misapply the law refusing to prohibit LEP from exercising its development rights based on its failure to pay maintenance costs on the property subject to development. Point 4 is denied.

*Point 13 – Unit Owners' Control of the Association*

Point 13 contends the trial court misapplied the law in determining "LEP's failure to turn control of the Association over to the Unit owners as required by [the Act] did not also terminate LEP's right to add additional condominium units" because "LEP purposefully violated multiple provisions of [§ 448.3-103] and purposefully acted in ways to ensure the Association would not file suit against LEP to collect unpaid assessments or complaining about LEP's failure to pay maintenance and expenses on real property LEP wanted to develop." We disagree.

The Association's Point 13 fails for the same reason as the previous point. Even if the trial court had found LEP acted in ways described in this point (which the court did not), the Association fails to cite any statute or caselaw to support the proposition that a developer loses its development rights by failing to turn over control of the Association to the unit owners. The Association cites § 448.3-103, which governs executive board members and officers, but does not provide that a developer's failure to act consistently with any of the statute's provisions terminates development rights. Accordingly, the trial court did not misapply the law in refusing to terminate LEP's development rights, based on its alleged failure to turn control of the Association over to the unit owners. Point 13 is denied.

11

*Point 10 – Order for LEP to Lay Asphalt*

Finally, with respect to LEP's development rights, the Association's tenth point takes issue with the trial court's order that LEP "lay a second layer of asphalt … within 60 days of the completion of the construction on the Point." In so ordering, the court actually found in favor of the Association and against LEP.

In Point 10, the Association nevertheless contends the trial court "erred in ordering LEP to install the second layer of asphalt … upon 'completion of the construction on the Point' because such is ambiguous in that there is no time limit in which LEP will be required to complete such construction." We disagree.

Although this point fails to state exactly how the trial court erred under our 84.13(d) and *Murphy v. Carron* standard of review – in violation of briefing requirements under Rule 84.04(d) – we nevertheless find no error or ambiguity in the court's order. The court's ruling is in accordance with the court's findings that LEP properly retained its development rights to the Point. Given that the road in question may be further damaged during the Point's construction, it is reasonable that the court did not order LEP to lay the asphalt any sooner. Any required completion date of that work would be based on speculation at this time. Point 10 is denied.

### *Assessments – Points 2, 8, 7 and 12*

The Association contends the trial court "misapplied the law" in determining the amount of assessments that LEP owed because the court: applied a 5-year statute of limitations for contract actions, instead of a 10-year statute of limitations (Point 2); determined LEP was entitled to a $49,000 credit "for unpaid assessments" that LEP paid in 2007, when the court ruled LEP did not owe assessments prior to 2013 (Point 8); determined LEP did not owe assessments for "garages or boat slips it controlled" (Point 7); and determined "subsequent

12

purchasers of condominium units were precluded from complaining about LEP's failure to pay condominium assessments" (Point 12). The following facts are relevant to these points.

The trial court found that "[a] condominium declaration is simply a contract." The court went on to find that the "Declaration in this instance clearly states the terms, covenants, conditions, easements, restrictions, use, limitations and obligations of the developer and the unit owners[.]"

With respect to assessments for common expenses, the court found that "[t]he evidence is clear that assessments were not being levied against units which were not yet sold." The court further found that unit owners and the Association had notice LEP was not paying assessments:

> Any unit owner and the Association were put on notice that LEP was not being assessed or paying assessments on units it owned, and which had not been sold, as early as 2004. LEP took no action to conceal this information.

The court nevertheless concluded, however, that LEP *is* liable for "assessments for the common expenses pursuant to the 'Allocated Interest' for [U]nits 1-E100 and 1-E101." The court limited the time period in which LEP owed the assessments to *after* March 28, 2013. The court ruled that "[t]he claims of the Association for unpaid assessments … prior to March 28, 2013" are "barred by the five-year statute of limitations" pursuant to § 516.120.1 (applying to "[a]ll actions upon contracts").

In determining the amount LEP owed, the trial court "calculated the amount through December 31, 2022 to be $36,198.78." The court also awarded the Association $65,000 in attorney fees authorized under the Declaration, which resulted in a partial judgment of $101,198.78. The court went on to determine a "net" partial judgment. The court: (1) first acknowledged that "LEP contributed the sum of $49,000 to the operating fund deficit in 2007"; (2) then determined that LEP "is entitled to a credit of $49,000 against the partial judgment";

13

and (3) ultimately awarded "a net partial judgment of $52,198.78" in favor of the Association and against LEP.

*Point 2 – Assessments Owed Prior to March 28, 2013*

Point 2 contends the trial court misapplied the law in determining that "the Association could not collect unpaid common expense assessments from LEP for amounts owed prior to March 28, 2013[,]" because the Court applied a 5-year statute of limitations and "the proper statute of limitations is 10 years[.]" We disagree.[8]

"In determining whether the five-year or ten-year statute of limitations is applicable to a breach of contract claim, the *sole* consideration is whether there is *any breach of a written promise to pay an amount of money*[.]" ***Sommers v. Kruse Mennillo, LLP***, 699 S.W.3d 525, 530 (Mo. App. 2024) (emphasis in original).

> Missouri has two statutes of limitation relating generally to contract actions[.] Section 516.110(1) applies to an "action upon any writing, whether sealed or unsealed, for the payment of money or property" and allows the claim to be brought within ten years. Section 516.120(1) applies to "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110."

***Hughes Dev. Co. v. Omega Realty Co.***, 951 S.W.2d 615, 616 (Mo. banc 1997). "Under 516.120, all claims must be brought within five years." ***Sommers***, 699 S.W.3d at 530. In ***Rolwing v. Nestle Holdings, Inc.***, 437 S.W.3d 180 (Mo. banc 2014), our Supreme Court explained:

> [T]he 10-year statute established by section 516.110(1) "applies to every breach of contract action in which the plaintiff seeks a judgment from the

---

[8] Alternatively, Point 2 argues that the trial court misapplied the law because the 5-year statute of limitations "should be waived or tolled until such time as the Unit owners gained control of the Association" based on LEP's alleged control of the Association. This argument lacks merit because it is based on alleged facts contrary to the court's findings. Specifically, the trial court found that LEP did *not* control the actions of the Association.

14

defendant *for payment of money the defendant agreed to pay in a written contract.*"

***Rolwing***, 437 S.W.3d at 183 (emphasis in original); *see* ***Hughes***, 951 S.W.2d at 617 (Section 516.110(1) applied because the plaintiff sought a judgment against the defendant for payment of money as agreed to in a contract); ***Sommers***, 699 S.W.3d at 530-32 (similar holding).

In this case, the Association's claim for unpaid assessments was an action seeking recovery of money from LEP. The Association did not have a lien or seek to enforce a lien. Specifically, the Association maintained that LEP's failure to pay assessments violated the Declaration as a contract. *See, e.g.*, ***Cornerstone Condo. Ass'n v. Dunlap***, 591 S.W.3d 880, 881 (Mo. App. 2019) (underlying claim for breach of contract relating to unit owner's failure to pay condominium assessments). As the trial court found, the Declaration was indeed a contract that stated "the terms, covenants, conditions, easements, restrictions, use, limitations and obligations of the developer and the unit owners[.]" While the Declaration establishes the procedures to determine if, and how much, money is owed, the Declaration is not in itself "*a written promise to pay an amount of money*[.]" ***Sommers***, 699 S.W.3d at 530. As such, the 10-year statute of limitations period pursuant to § 516.110(1) does not apply. ***Id***.; *compare* ***Hughes***, 951 S.W.2d at 617; ***Sommers***, 699 S.W.3d at 530-32. Because the underlying claim is still an action upon contract, the trial court correctly applied the 5-year limitation period under § 516.120(1); *see* ***Rolwing***, 437 S.W.3d at 183.[9]

---

[9] A claim for assessments could also be an action upon a liability created by statute. *See* § 448.3-115 (governing assessments for common expenses). Such an action is similarly included in the 5-year limitation period under § 516.120(2) as "[a]n action upon a liability created by a statute other than a penalty or forfeiture[.]" ***Id***.

15

The Association argues the 10-year statute of limitations applies pursuant to § 516.010 as an action for recovery of lands:

> No action for the *recovery of any lands, tenements or hereditaments*, or for the recovery of the possession thereof, shall be commenced, had or maintained by any person, whether citizen, denizen, alien, resident or nonresident of this state, unless it appear that the plaintiff, his ancestor, predecessor, grantor or other person under whom he claims was seized or possessed of the premises in question, *within ten years before the commencement of such action*.

*Id*. (emphasis added). The Association recognizes it does not seek to recover any lands, but nevertheless argues it seeks to recover "hereditaments[,]" which can include easements running with the land in restrictive covenants. *See* ***Terre Du Lac Prop. Owners' Ass'n v. Wideman***, 655 S.W.2d 803, 805 n.1 (Mo. App. 1983). This argument lacks merit for two reasons.

First, a hereditament must be inheritable. *See, e.g.*, ***Orchard v. Wright-Dalton-Bell-Anchor Store Co.***, 125 S.W. 486, 496 (Mo. 1909); ***McLaughlin v. Neiger***, 286 S.W.2d 380, 384 (Mo. App. 1956); *Blacks Law Dictionary* 872 (11th ed. 2019) (defining a hereditament as "[a]ny property that can be inherited; anything that passes by intestacy" or "[r]eal property; land"). An unpaid assessment is not inheritable upon the death of the person obligated to pay, and it does not descend by intestacy as an heir's obligation. *See* ***The Ventana Owners Ass'n, Inc. v. Ventana KC, LLC***, 481 S.W.3d 75, 79 (Mo. App. 2015) ("contractual personal debt for unpaid assessments … is enforceable only against the owner who did not pay assessments").

Second, the only case relied upon by the Association is factually distinguishable. In ***Kuehnle v. Gray***, 865 S.W.2d 439 (Mo. App. 1993), owners of a lot in a subdivision argued the enforcement of liens on their property was barred by the 5-year statute of limitations. *Id*. at 441. The eastern district of this Court held that enforcement of liens in that case was governed by § 516.010 as an action to recover "hereditaments." ***Kuehnle***, 865 S.W.2d at 441. ***Kuehnle*** is factually distinguishable from the case at bar in three respects. First, this case does not

16

involve the enforcement of a lien. *See Ventana*, 481 S.W.3d at 79 ("personal debt of an owner for unpaid assessments, collected by an action for a money judgment, is not enforcement of a lien"). Furthermore, *Kuehnle* involved a lien on a subdivision lot – not a condominium unit. The Act specifically authorizes a lien for unpaid assessments on a condominium unit, pursuant to § 448.3-116, and further imposes a *3-year limitation* period to enforce the lien:

> A lien for unpaid assessments is extinguished unless proceedings to enforce the lien are instituted within three years after the full amount of the assessments becomes due.

§ 448.3-116.5. Finally, the Association sought recovery of money from LEP for violations of the Declaration as a breach-of-contract action. As established previously, because the Association's contract action was not based on a written promise to pay an amount of money, the 10-year statute of limitations period under § 516.110(1) does *not* apply. Instead, § 516.120(1) applies, and it narrows the period of limitation to five years. *See Rolwing*, 437 S.W.3d at 183. Accordingly, the trial court did not misapply the law in determining that the 5-year limitation period applied and that the Association could not collect unpaid common expense assessments from LEP for amounts owed prior to March 28, 2013. Point 2 is denied.

*Point 8 – LEP's $49,000 Credit*

Point 8 contends the trial court misapplied the law in determining "LEP was entitled to a credit of $49,000 in payments made in 2007 for amounts it owed for unpaid assessments from March 28, 2013" because "such ruling was inconsistent" with the court's finding that "LEP did not owe unpaid condominium assessments prior to March 28, 2013 due to a five-year statute of limitations but still gave LEP credit for payments made in 2007." We disagree.

The Association's eighth point is based on a faulty premise. The trial court specifically found that LEP contributed the $49,000 to the operating fund deficit in 2007, not to pay assessments. Further, the trial court did not apply the $49,000 specifically to unpaid

17

assessments.  The court instead applied the credit generally to a partial judgment that included $65,000 in attorney fees. The Association makes no other argument that ties the credit to assessments.  As such, the trial court did not misapply the law in determining LEP was entitled to a credit of $49,000.  Point 8 is denied.

*Point 7 – Assessments for Garage Spaces and Boat Slips*

The Association's seventh point challenges the trial court's determination that LEP did not owe assessments for garage spaces and boat slips that LEP controls.  In order to better understand this point, the following statutory framework under the Act applies.

The Act makes a distinction between common elements and "limited" common elements.  The Act defines "limited" common elements as common elements "for the exclusive use of one or more but fewer than all of the units":

> (4) **"Common elements"** means all portions of a condominium other than the units;
> …
> (17) **"Limited common element"** means a portion of the common elements allocated by the declaration or by operation of subdivision (2) or (4) of section 448.2-102 for the *exclusive use of one or more but fewer than all of the units*[.]

§ 448.1-103(4) and (17) (italicized emphasis added).  Further, common elements and "limited" common elements are addressed separately in § 448.2-107 (common elements) and § 448.2-108 (limited common elements).

Section 448.2-107 provides, in relevant part, that allocations of interests in "common elements and in the common expenses … may not discriminate in favor of units owned by the declarant":

> The declaration shall allocate a fraction or percentage of undivided interests in the common elements and in the common expenses of the association, and a portion of the votes in the association, to each unit and state the formulas used to establish those allocations. *Such allocations may not discriminate in favor of units owned by the declarant.*

18

§ 448.2-107.1 (emphasis added).

Section 448.2-108 governs "limited" common elements and does *not* include a provision prohibiting discrimination in favor of units owned by the declarant:

> 1. Except for the limited common elements described in subdivisions (2) and (4) of section 448.2-102, the declaration shall specify to which unit or units each limited common element is allocated. That allocation may not be altered without the consent of the unit owners whose units are affected.
>
> 2. Except as the declaration otherwise provides, a limited common element may be reallocated by an amendment to the declaration executed by the unit owners between or among whose units the reallocation is made. The persons executing the amendment shall provide a copy thereof to the association, which shall record such copy. The amendment shall be recorded in the names of the parties and the condominium.
>
> 3. No common element not previously allocated as a limited common element may be so allocated except pursuant to provisions in the declaration made in accordance with subdivision (7) of section 448.2-105. The allocations shall be made by amendments to the declaration.

§ 448.2-108.[10]

With the aforementioned statutory framework in mind, the trial court made the following findings relevant to this point. With respect to garage spaces, the court found that "LEP is the owner of 11 garage spaces not otherwise assigned to condominium units at [the Project] as set forth in the Declaration." The court further found that "[n]o Garage Spaces have been assigned to LEP" and because assessments begin once assigned, the court concluded that LEP does not owe assessments for garage spaces. In support of its ruling, the court relied on

---

[10] This statue mentions two other sections, but neither prohibits discrimination against unit owners in favor of a developer. Section 448.2-102 addresses "unit boundaries" that include limited common elements in subsections (2) and (4). Section 448.2-105 simply requires a declaration to contain a description of real estate "allocated subsequently as limited common elements[.]" § 448.2-105.1(7).

19

Declaration provisions and the distinction between common elements and "limited" common elements under the Act. The trial court explained:

> Section 4.5 of the Declaration provides that unit owners may request the assignment of one or more Garage Spaces. Unit owners are required to pay LEP a one-time assignment fee for the assignment of the Garage Space which shall be irrevocably assigned and become appurtenant to the unit. An owner to [whom] a Garage Space is assigned shall be assessed for the repairs, maintenance, insurance and real estate taxes attributable [to] said space.
>
> Section 9.2.3 of the Declaration provides that any common expense associated with the maintenance, repair, or replacement of a *Limited* Common Element shall be assessed against the unit or units to which the Limited Common Element is assigned[.] No Garage Spaces have been assigned to LEP.
>
> While Section 448.2-107.1 makes clear that allocations of interests in the *common* elements and common expenses may not discriminate in favor of units owned by the declarant[,] **no such discrimination language appears in Section 448.2-108 as to the allocation of interest in *limited* common elements**. The Association and unit owners have had notice since 2004 and thereafter that LEP was not being assessed and was not paying assessments on Garage Spaces it retained and which had not been assigned[.] While this treatment is certainly favorable to LEP it is in accordance with the provisions of the Declaration and does not violate [the Act]. LEP's failure to pay expenses on the garages is not discriminatory.

(Emphasis added.)

> The court made similar findings with respect to boat slips. The court found:
>
> LEP does not lease nor has it leased any boat dock slip. Accordingly, LEP does not owe any assessments for common expenses for boat dock slips it owns and for which it has reserved the right to receive the one-time Base Rate/Base Rent payment. The Association and Unit Owners have had notice since 2004 and thereafter that LEP was not being assessed and was not paying assessments on boat dock slips it still owned and which had not yet been leased to a Unit Owner. While this treatment is certainly favorable to LEP it is in accordance with the provisions of the Declaration and does not violate [the Act]. LEP's failure to pay expenses on the boat docks is not discriminatory.

Point 7 contends the trial court misapplied the law in determining "LEP does not owe any assessments for limited common element garages or boat slips it controlled because such are limited common elements for which the allocation of expenses may not discriminate in

20

favor of the developer under R.S.Mo. § 448.2-107, in that the Court found such garages and boat slips were not common elements."

In support of this point, the Association argues "a limited common element is also by definition a common element" under § 448.1-103, and therefore "allocations for expenses for limited common elements are also covered by non-discriminatory allocations set forth in R.S.Mo. § 448.2-107" for common elements. According to the Association, "[b]ecause LEP's method of allocation for expenses for garage spaces [and boat slips] it owns is purposefully set up in LEP's favor so that it does not pay assessments" on them, "such is discriminatory in its favor and is a violation of § 448.2-107." We disagree.

The Association's argument lacks merit because it ignores the distinction between common and limited common elements, and the different treatment of those elements in the Act. *See* § 448.1-103(4) and (17); § 448.2-107; § 448.2-108. Thus, "limited" common elements are different types of common elements that are necessarily treated differently than common elements and subject to separate requirements. *See* § 448.1-103(17); § 448.2-108. Further, the Association's argument treating limited and common elements the same would render the "limited" common element distinction meaningless, contrary to the well settled tenets of statutory interpretation. *See* ***T.B. III v. N.B.***, 478 S.W.3d 504, 510 (Mo. App. 2015) ("[c]ourts should avoid interpreting statutes in a way that leaves the statutory language meaningless"). Accordingly, the trial court did not misapply the law in determining that LEP did not owe any assessments for limited-common-element garage spaces or boat slips it controlled. Point 7 is denied.

*Point 12 – Complaints from Subsequent Purchases*

Point 12 contends the trial court misapplied the law "in finding subsequent purchasers of condominium units were precluded from complaining about LEP's failure to pay

condominium assessments and assessments or costs for the upkeep of LEP's garages and boat slips" because "such actions of LEP are violations of [the Act] and there is no contractual right of the developer to change its obligations to pay assessments for the maintenance of common elements." We disagree.

This point, as we understand it, is based on a finding that the trial court did not make. We have carefully reviewed the 36-page judgment and are unable to locate any finding that "subsequent purchasers of condominium units were precluded from complaining about LEP's failure to pay condominium assessments[.]" Therefore, Point 12 is denied.[11]

### *Evidentiary Matter – Point 11*

Point 11 challenges the trial court's reliance on Dabbs' testimony at trial. Our review is for abuse of discretion. ***Beckmann v. Phillips***, 704 S.W.3d 404, 412 (Mo. App. 2024). The following facts are relevant to this point.

During Dabbs' testimony at trial, the Association's counsel discovered Dabbs was reading from an outline prepared by Dabbs and LEP's counsel. The Association's counsel objected, stating that Dabbs' testimony was not based on his knowledge, and requested that the testimony be stricken. The trial court ruled that Dabbs should not be testifying from notes, but the judge refused to strike the testimony for the following reason:

> I'm not going to strike his testimony. If you want to go over it on cross, you know, to establish what he does or doesn't remember, that may affect the weight his testimony is to be given.

Point 11 contends the trial court "erred in relying on the testimony of [Dabbs] because [his] testimony was tainted in that during trial, [Dabbs] testified from a previously prepared outline created by his attorney." We disagree.

---

[11] To the extent that this point is re-arguing LEP's obligation to pay assessments for garage spaces and boat slips it controls, that issue was fully addressed in Point 7.

Here, the Association has failed to show the trial court's ruling was "clearly against the logic of the circumstances [and] so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." **Dickerson v. Dickerson**, 580 S.W.3d 98, 103 (Mo. App. 2019). Further, in bench-tried cases, the trial court "is given more latitude in the admission of evidence." **State v. Coaston**, 609 S.W.3d 527, 528 (Mo. App. 2020); *see* **Kenney v. Myers**, 674 S.W.3d 139, 146 (Mo. App. 2023) ("it is nearly impossible to obtain a reversal based upon the improper admission of evidence in a court-tried case"). Finding no abuse of discretion, Point 11 is denied.

### Against the Weight of the Evidence – Points 1, 5, 6 and 9

The Association maintains the following findings are against the weight of the evidence: "any finding against unconscionability" (Point 1)[12]; the omission of "assessments for Unit 1E-101 from October 1, 2019 to December 31, 2022" in the court's "calculations for assessments owed by LEP" (Point 5); that "the Association only began charging 18% interest on unpaid assessments November 16, 2019" (Point 6); and that "LEP was the owner of boat docks and other marina facilities" (Point 9).

An against-the-weight-of-the-evidence challenge assumes the "existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact." **Houston v. Crider**, 317 S.W.3d

---

[12] We address Point 1 even though it is multifarious, as it alleges "*more than one* of the *Murphy v. Carron* standards" of review. **Ebert v. Ebert**, 627 S.W.3d 571, 580 (Mo. App. 2021) (emphasis in original). "In our discretion, we may review all, some, or none of a multifarious point relied on." **Atchley v. Missouri Highways & Transp. Comm'n**, 697 S.W.3d 90, 94 n.1 (Mo. App. 2024). Point 1 first alleges that the trial court "misapplied the law" by "disregarding the procedural and substantive unconscionability of [LEP's] development scheme and actions[.]" The point goes on to allege that "any finding against unconscionability is against the weight of the evidence." In our discretion, we address only the latter allegation of error. *See* **Atchley**, 697 S.W.3d at 94.

23

178, 186 (Mo. App. 2010); *Sauvain v. Acceptance Indem. Ins. Co.*, 437 S.W.3d 296, 304 (Mo. App. 2014); *Schuman v. Schuman*, 612 S.W.3d 232, 238 (Mo. App. 2020). Consequently, this challenge requires the completion of four sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston*, 317 S.W.3d at 187. Here, the Association has failed to follow this mandatory sequence, which renders its arguments analytically useless and provides no support for these challenges. *See Wax v. Vickers*, 701 S.W.3d 903, 909 (Mo. App. 2024). Accordingly, the Association's contentions that certain findings are against the weight of the evidence lack merit. Points 1, 5, 6 and 9 are denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

MARY W. SHEFFIELD, J – CONCUR

JACK A. L. GOODMAN, J. – CONCUR

24